# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CNH AMERICA, LLC,

        Plaintiff,

    v.                               Case No. 09-C-999

CHAMPION ENVIRONMENTAL
SERVICES, INC., and AMERICAN
SAFETY RISK RETENTION GROUP,
INC.,

        Defendant.

---

### DECISION AND ORDER GRANTING IN PART AND DENYING IN PART CHAMPION ENVRIONMENTAL'S SUMMARY JUDGMENT MOTION AND DENYING CNH AMERICA'S PARTIAL SUMMARY JUDGMENT MOTION

---

## I. PROCEDURAL BACKGROUND

This action was commenced on October 21, 2009, when the plaintiff, CNH America, LLC ("CNH"), filed a complaint in the United States District Court for the Eastern District of Wisconsin against Champion Environmental Services, Inc. ("Champion") and American Safety Risk Retention Group, Inc. ("ASRRG"), pursuant to §§ 107(a) and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a), 9613. CNH has also asserted "pendent and related state law claims." (Compl. ¶ 4.) CNH's claims all relate to Champion's depositing of PCB-laden material on CNH's property, which is located at 24th and Mead Street in the Village of Mount Pleasant, Wisconsin on the south side of Racine (the "Property"). (Compl. ¶ 9.)

The court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1367, and venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(b)(1) and 42 U.S.C.

§ 9613(b). All parties have consented to the exercise of jurisdiction by a magistrate judge. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73(b)(1).

This matter is now before the court on Champion's motion for summary judgment, as well as CNH's motion for partial summary judgment. The motions have now been fully briefed and are ready for resolution. For the reasons that follow, Champion's motion for summary judgment will be granted in part and denied in part, and CNH's motion for partial summary judgment will be denied.

## II. FACTUAL BACKGROUND

This action revolves around a simple, undisputed fact: Champion deposited PCB-laden material onto a portion of CNH's Property, specifically, the R9 area of its Property. However, a review of the parties' proposed findings of fact and responses thereto reveal that there is little else to which the parties agree. Most significantly, the parties dispute the origin of the material used to fill the R9 area.[1]

---

[1] On April 27, 2011, CNH moved to file amended responses to Champion's proposed findings of fact because counsel mistakenly failed to "include specific reference to supporting materials" and "any argument or evidence supporting a denial or objection." (ECF No. 78, at 1.) In the court's June 16, 2011 Order, the court granted CNH additional time to file amended responses that included "in addition to the original responses, specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon." (ECF No. 96.)

On July 25, 2011, Champion filed a Civil L.R. 7(h) expedited non-dispositive motion to strike CNH's amended responses to Champion's proposed findings of fact. Champion argues that CNH was only permitted to add citations to the record. Admittedly, in the court's June 16, 2011 Order, Civil L.R. 56(b)(2)(B)(i) was not quoted in its entirety. In responding to the moving party's statement of facts, Civil L.R. 56(b)(2)(B)(i) indicates that a party is to include a "response to each paragraph." And it is this response that is to include citations to the materials relied upon. Merely providing citations without providing any kind of response (other than "deny") would not help the court, or the opposing party, in determining what it is that the party is disputing. Perhaps the court may have contributed to the confusion by granting in part and denying in part CNH's motion to file amended responses, but the fact remains that adding only citations to its original response, which simply either "admitted" or "denied" a proposed fact, would have resulted in a response that was not helpful to and burdensome on the court. Therefore, Champion's motion to strike CNH's amended responses will be denied.

## A.  The Parties and the Contract

CNH's Property encompasses approximately 100 acres and borders Lake Michigan to the East. (Def.'s Proposed Findings of Fact ("DPFOF") ¶ 2.)  Beginning in the early 1900s, CNH operated a foundry and tractor assembly plant at the Property.  (Pl.'s Proposed Findings of Fact ("PPFOF") ¶ 2.) In 2002, CNH ceased operating the tractor assembly plant, and in 2004, it ceased operating the foundry.  (PPFOF ¶ 3.)

Dominic Gorniak ("Gorniak") is the President of Champion.  (PPFOF ¶ 5.)  Gorniak and his wife created an LLC called E&G Developments, LLC to hold the real property that is Racine Steel Castings, which was purchased in 2004.  (PPFOF ¶ 42.)

In July 2004, CNH and Champion entered into a contract (hereinafter referred to as the "Contract"), which states, in pertinent part, as follows:

> The Contractor [Champion] shall remove from the Project site and properly and legally dispose of all demolished and dismantled equipment, property, materials and debris.  The contractor shall fill all pits, basements, utility tunnels and other subsurface openings located on said real estate with crushed construction grade fill concrete (comprised from concrete and concrete block obtained from the Project Site) as specified by the Owner. . . . All of the Work shall be performed in strict accordance with all applicable statutes, laws, ordinances, codes and governmental rules and regulations.  When the Work is substantially completed, the Project Site shall be reduced to grade level without any improvements remaining thereon; and the site shall be in compliance with all applicable statutes, laws, ordinances, codes and governmental rules and regulations.

(Lutz Aff. ¶ 2, Ex. 2.)

## B.  The PCB Dumping Incident

On January 5, 2007, CNH's Jim McBain ("McBain") observed a Champion truck delivering fill material to fill a large basement area of the Property referred to as R9, which had been the tractor assembly portion of the plant.  (PPFOF ¶¶ 13-14.)  Although the Contract states that the material used to fill the R9 area be "obtained" from the Site, Champion's truck came from outside of CNH's

Property.  (PPFOF ¶ 15.)  Rick Tooker ("Tooker"), Champion's then Vice-President, told McBain that the fill material came from Racine Steel Castings (although the parties dispute from which site the fill originated), and that it had delivered 20-25 truck loads of fill material to the R9 basement area of the Property.  (PPFOF ¶¶ 41, 48-49.)[2]  McBain testified that he was immediately suspicious of the fill material because it had a noticeable diesel-type odor emanating from it.  (PPFOF ¶ 16.)

That same day, January 5, 2007, CNH had the environmental consulting firm RMT, Inc. take samples of the fill material.  (PPFOF ¶ 21.)  The laboratory analysis revealed that the fill material was contaminated with PCBs, gasoline range organics, and diesel range organics.  (PPFOF ¶ 22.)  McBain informed Champion that the fill material was contaminated and asked Champion to remove it. (PPFOF ¶ 23.)  Thereafter, Tooker offered to remove the fill.  (PPFOF ¶ 25.)  However, Champion maintains that Gorniak, its President, who "had the authority and was responsible for entering into all agreements with regard to Champion's work at the CNH" Property, never agreed to remove the fill. (Def.'s Resp. to PPFOF ¶ 24.)

Because Champion had not yet removed the fill material, throughout October, November, and December 2007, CNH again asked Champion to remove the contaminated soil and perform post-excavation testing.  (PPFOF ¶¶ 27-29.)  On January 9, 2008, representatives of Champion and CNH met at the Property to discuss removing the contaminated fill material, at which time Tooker once again promised to remove the fill.  (PPFOF ¶¶ 30, 32.)  In a follow-up letter, CNH's Senior Managing Attorney David Mueller confirmed Tooker's January 9, 2008 promise to remove the contaminated fill material.  (PPFOF ¶ 33.)  Tooker testified that, although he had no idea of the extent of contamination or severity of it and thought it would be a simple clean-up, he promised CNH that

---

[2]  A.W. Oakes also provided several hundred truckloads of fill to the R9 area.  (DPFOF ¶ 25.)

Champion would remove the fill by June 2008. (PPFOF ¶ 36, Def.'s Resp. to PPFOF ¶ 35.) However, by late June 2008, Champion had not yet removed the contaminated fill. Thus, CNH emailed Champion asking for an update. (PPFOF ¶ 38.) Tooker does not recall ever responding to this email, but Tooker believed that sometime after May 12, 2008, Gorniak told him for the first time that Champion would not remove the PCB-contaminated fill material. (PPFOF ¶ 39.)

In the aftermath of Champion's dumping PCBs onto the R9 area of the CNH Property, McBain and Gorniak agree that they discussed the incident. But, McBain and Gorniak offered conflicting testimony. McBain testified that, in January 2007, Tooker told him that the fill material (or at least part of it) came from Racine Steel Castings, and that Champion would take care of it. (Harken Aff. ¶ 4, Ex. B, at 108.)[3] McBain also testified that, about "a month or two later, maybe even more," Gorniak told him that the fill was CNH material "taken from the site, kept at Racine Steel, crushed at Racine Steel, and then brought back . . . ." (Harken Aff. ¶ 4, Ex. B, at 108.) On the other hand, Gorniak testified that he spoke with McBain via telephone in *January 2007* and told McBain that "the material [Champion] crushed was [CNH's] material" and that Champion was not responsible for it. (Def.'s Resp. to PPFOF ¶ 50; Harken Aff. ¶ 3, Ex. A, at 86-87; PPFOF ¶ 54.)[4]

On September 2, 2009, CNH, "on behalf of Champion Environmental Services, [I]nc.[,] notified the Wisconsin Department of Natural Resources ("WDNR") that soil contamination had been detected at [the Property]." (Cabush Aff. ¶ 12, Ex. 9.) On October 8, 2009, the WDNR sent a letter

---

[3] Tooker testified that, in his investigation of the source of the fill material, he thought that the material had come from a pile of crushed brick, block, and concrete from - - from [] Champion's Racine Steel site." (Lutz Aff. ¶ 5, Ex. 5, at 86.)

[4] Although Champion's site superintendent at the CNH project and one of its truck drivers testified that they had no knowledge of any materials being taken from CNH's Property and delivered to Racine Steel Castings, Champion employee James Evans recalls between three and five loads of brick and iron scrap being taken from the CNH Property to Racine Steel Castings. (PPFOF ¶¶ 52-53.)

to Champion, stating as follows: "Based on the information that has been submitted to the WDNR regarding this site, we believe Champion Environmental Services, Inc. is responsible for investigating and restoring the environment at [the Property] under Section 292.11, Wisconsin Statutes, known as the hazardous substances spills law." (Cabush Aff. ¶ 12, Ex. 9.)

The contaminated area has been determined to measure 375 feet by 180 feet. ( DPFOF ¶ 32.) Test America analyzed samples of the contaminated fill material in January 2007 (sample taken by CNH) and again in November 2007 (sample taken by Champion). (PPFOF ¶ 65.) Originally, the November 2007 analytical test results showed the presence of Aroclor 1254, but the January 2007 results did not. (PPFOF ¶ 66.) However, the November 2007 results have since been discredited because the results erroneously reported the presence of Aroclor 1254, and Test America has revised its November 2007 report to reflect the absence of Aroclor 1254. (PPFOF ¶¶ 67, 69.) CNH has not applied for any permits related to potential cleanup of the site. (DPFOF ¶ 34.) CNH has also not provided a notice and comment period to the public. (DPFOF ¶ 36.)

## C. Other PCB Related Information

Other areas of CNH's Property have also been found to have been contaminated with PCBs. In the 1990s, an area known as the chip staging area was identified as being PCB-contaminated. (DPFOF ¶ 13.) PCB contamination was also identified at areas known as the former loading dock area, the powerhouse area, and the AST vault area, among others. (DPFOF ¶ 14.) However, PCB concentrations found at other locations of the CNH Property are at least ten times less than those found in the contaminated fill material. (PPFOF ¶ 57.)

Moreover, CNH's expert, Thomas Stolzenburg ("Stolzenburg"), opines that the contaminated fill material contains no measurable PCBs with Aroclor 1254, unlike all of the other identified PCBs present on the CNH Property. (PPFOF ¶ 61.) However, Champion's expert, Michael J. Prattke

("Prattke"), disagreed with this fingerprint analysis, believing the Aroclor 1254 had been found in the contaminated fill material and comparing it to one area of the Property called the former loading dock area, which had a comparable Aroclor fingerprinting containing 1254. (PPFOF ¶ 62; DPFOF ¶ 14.)

Racine Steel Castings has also had a history of using PCBs in its operations. The Racine Steel Castings site had at one time PCB-containing electrical gear. (PPFOF ¶ 43.) In April 2004, Midwest Electrical Testing and Maintenance Co., Inc. ("Midwest Electrical") sampled the "oil filled transformers and switches at Racine Steel Castings," and concluded that Racine Steel Castings had PCB-containing transformers and electrical gear. (Lutz Aff. ¶ 23, Ex. 23, Exs. A & B to Powell Aff.) Gorniak testified that he hired a company to dispose of the PCB-filled and contaminated equipment in 2004, which was within a year of purchasing the property, that he was the one that "personally arranged with [another] company to dispose" of the PCB-filled and contaminated equipment, but that he does not recall the company that he hired to do such task, other than that it may have been from Michigan or Ohio. (Harken Aff. ¶ 7, Ex. E, at 40-41.) Gorniak testified that Champion would usually get three or four estimates for this type of work, (Harken Aff. ¶ 7, Ex. E, at 39), but the only companies that gave Champion estimates that Gorniak could name were Midwest Electrical and OSI Environmental, Inc. ("OSI"). (PPFOF ¶ 47.) Neither Midwest Electrical nor OSI has any record nor do its personnel have any recollection of having done the disposal work. (PPFOF ¶ 47.) Furthermore, Gorniak did not recall if the fluid had to be drained first from the transformers or if the fluid was taken separately. (Harken Aff. ¶ 7, Ex. E, at 41.)

### III. SUMMARY JUDGMENT STANDARD

A district court shall grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might

affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). However, a mere scintilla of evidence in support of the nonmovant's position is insufficient. *See Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "'[I]n the light most favorable' . . . 'simply means that summary judgment is not appropriate if the court must make a choice of inferences.'" *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003) (quoting *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997)).

# IV. DISCUSSION

CNH alleges seven claims against Champion: (1) CERCLA liability, (2) breach of contract; (3) negligence, (4) nuisance, (5) trespass,[5] (6) strict liability, and (7) punitive damages. CNH has moved for partial summary judgment against Champion and its insurer, ASRRG, on its CERCLA, breach of contract, negligence, nuisance, and strict liability[6] claims. CNH has also moved for the dismissal of the counterclaims.[7] Additionally, Champion has moved for summary judgment with respect to all of CNH's claims.

There are two preliminary matters that must be addressed before turning to the parties' respective summary judgment motions. First, CNH filed a motion to strike the opinions of Champion's expert Michael Prattke. Second, central to this case is the issue of the origination of the contaminated fill. CNH contends that the PCBs originated from the Racine Steel Castings facility. Champion contends just the opposite: that the PCBs came from CNH's Property—it merely transported the fill material from CNH to Racine Steel Castings to be crushed, and then transported the fill material back to the CNH Property. Thus, the facts relating to the origination issue will be examined preliminarily, before moving on to CNH's claims against Champion.

---

[5] CNH cannot maintain its trespass claim against Champion because CNH failed to plead this claim in its amended complaint. *See* Fed. R. Civ. P. 8; Fed. R. Civ. P. 12. Accordingly, Champion's motion will be granted to the extent it seeks dismissal of CNH's trespass claim.

[6] CNH's motion for partial summary judgment does not seek summary judgment on its strict liability claim. It was not until CNH filed its response brief to Champion's motion for summary judgment on April 11, 2011 that it claims it is entitled to summary judgment on this claim and that it provides support for such argument. In any event, the court will construe CNH's argument as a motion for summary judgment on its strict liability claim.

[7] CNH, other than requesting judgment on the counterclaims, presents no argument as to why the court should dismiss the counterclaims. Perhaps this is because, in their respective Answers to CNH's Amended Complaint filed on March 15, 2010, Champion and ASRRG have plead no counterclaims. (*See* Dkt. Nos. 35, 37.) To the extent CNH seeks dismissal of the counterclaims, its motion will be denied as moot.

## A. Motion to Strike

CNH has moved to strike two of Prattke's opinions on the basis that his opinion is "just a reiteration of Mr. Gorniak's testimony, relies on a now discredited laboratory report, and is based on a non-scientific lay observation that the acreage of CNH's property was more than the acreage at Racine Steel Castings." (Pl.'s Br. in Support of Mot. to Strike Opinions of Defendants' Expert Prattke (hereinafter cited as "Pl.'s Mot. Strike") 4.) Prattke's opinions that CNH has now moved to strike are (1) that "[t]he identified contamination is likely the result of a release of PCB fluid from an industrial transformer or electrical switchgear at the CNH site," and (2) that he "[d]isagree[s] with CNH's conclusion that the identified PCB contamination could not have originated from the CNH site." (Pl.'s Reply Br. in Support of Mot. to Strike Opinions of Defendants' Expert Prattke (hereinafter cited as "Pl.'s Reply Mot. Strike") 1-5; Prattke Report 5-6, ECF No. 60, Ex. A.)

The admissibility of expert evidence is governed by Federal Rule of Evidence 702 and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Champion, as the proponent of Prattke's opinion testimony and report on the issue of origination of the PCB contamination, bears the burden of proof with respect to whether the admissibility requirements are met.

Rule 702 assigns the trial judge the "gate-keeping function" of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 F.3d at 597. Specifically, Rule 702 states as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

This standard requires a three-prong analysis: (1) whether the expert is qualified; (2) whether his or her methodology or reasoning is scientifically reliable; and (3) whether the testimony will "'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011) (quoting Fed. R. Evid. 702; citing *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)).

*Daubert* sets forth the following non-exhaustive factors for the district court to consider when assessing an expert's methodology: (1) whether the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community. *Id.* at 894 (citing *Dabuert*, 509 U.S. at 593-94). "Of course, *Daubert* is a flexible test and no single factor, even testing, is dispositive." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151-52 (1999)).

CNH argues that Prattke's conclusions are based on three faulty premises:

1) Prattke accepted as true the deposition testimony of Mr. Gorniak that Champion had taken demolished debris and scrap from the CNH property to the Racine Steel Casting site, ground them up, and then returned them to CNH's property without commingling them with any other materials from outside the CNH property.

2) Prattke relied on a now discredited report of PCB Aroclor numbers from the Test America laboratory, drawn from a November 2007 sampling done by Champion's Mr. Tooker showing that Aroclor 1254 was present in the contaminated fill material and that made it analogous to PCB contamination found years ago in the loading dock area at CNH's property.

3) Prattke believes that because the CNH property is an approximately 100 acre industrial facility that has been in operation for several decades and had transformers on it, that this necessarily makes it a more likely source of PCB contamination than Racine Steel Castings which was on an approximate[ly] 11 acre site.

(Pl.'s Mot. Strike 1-2.)

Turning to CNH's first argument—that Prattke's opinion is unreliable because he has relied on Gorniak's testimony—the court find that this reason, alone, is not enough to strike Prattke's opinion on the basis that it is unreliable. To be sure, the opinion of an "expert" who merely parrots another's views has been found to be inadmissable because such methodology does not pass muster under *Daubert*. Here, however, Prattke did more than rely on Gorniak's testimony that the material Champion brought to the CNH Property originated therefrom. As Champion points out, Prattke also relied on applicable regulations governing PCBs throughout the history of the CNH site, factual testimony in the case, a review of data samples taken from the fill material, a review of historical data samples taken from the CNH site and analyzed for PCBs, and estimations of the mass of contamination in comparison to the volume of PCB fluid historically used in industrial electric equipment at the CNH site. (Def.'s Resp. Br. to Mot. to Strike Opinions of Defendants' Expert Prattke (hereinafter cited as "Def.'s Resp. Mot. Strike") 10.) It also appears that Prattke analyzed historical operations at the Racine Steel Castings site as well. (Prattke Report 7, ECF No. 60, Ex. A.) In total, Prattke indicated that he researched and relied on 32 documents, which spanned approximately 1000 pages. (*See* Prattke Report Att. A, ECF No. 60, Ex. A.) Thus, while Prattke's methodology would have been flawed had he relied *only* on Gorniak's testimony, Prattke's methodology was more inclusive than merely serving as a conduit of Gorniak's opinion. Thus, it would be improper to strike Prattke's opinion as to the disputed issue of origination on this basis alone.

CNH's next argument is that Prattke improperly relied on a Test America laboratory report, drawn from a November 2007 sampling done by Champion that has since been discredited.[8]

---

[8] In it's three and one-half page supporting memorandum, CNH moved to strike Prattke's opinion with respect to the Aroclor fingerprinting solely because the test results pertaining to the November 2007 sampling have since been discredited. In a fifteen page reply, CNH argued, for the

According to Prattke, the November 7, 2007 test results of the fill on the CNH Property is an example of why Stolzenburg's fingerprint comparison analysis is based on "poor methodology" and why it fails to "recognize significant limitations." (Def.'s Resp. Mot. Strike 6-7.) Prattke opines that a limited number of samples that are collected by multiple parties over a period of years and analyzed with different equipment and interpreted by different analysts may result in discrepancies in fingerprinting comparison analysis. Prattke relies on the since-discredited November 2007 test results to rebut Stolzenburg's opinion that, because of the fingerprint analysis, the PCB-contaminated fill had to have originated at the CNH Property. This is a quintessential "battle of the experts," and CNH's concerns speak to credibility, not admissibility.[9]

Finally, CNH contends that Prattke's opinion as to the origination of the contaminated fill is based on speculation because he inappropriately bases his opinion on the size, complexity, and history of the CNH Property to determine that it is more likely that the contaminated material originated at the CNH Property. CNH relies on Prattke's deposition testimony wherein he is alleged to have admitted "that he would be speculating if he concluded that there were PCB spills from transformers at CNH, because he saw no evidence of such a spill at CNH." (Pl.'s Mot. Strike 3.) The deposition testimony to which CNH cites states as follows:

---

first time, that "Prattke is not qualified to dispute the reliability of PCB Aroclor fingerprinting analysis because he lacks "requisite knowledge, skill, experience, training or education." (Pl.'s Reply Mot. Strike 6.) Because this argument was not raised until CNH's reply, it will not be considered. *See Carter v. Tennant Co.*, 383 F.3d 673, 679 (7th Cir. 2004) (holding that arguments raised for the first time in a reply brief are considered waived).

[9] CNH contends that "the scientific method and reliability of distinguishing PCBs by Aroclors has regularly been relied upon by Federal courts." (Pl.'s Reply Mot. Strike 7.) However, Prattke does not appear to opine that PCB Aroclor fingerprint analysis is generally unreliable. Rather, Prattke opines that Stolzenburg failed to recognize limitations in the fingerprint *comparison* analysis for this case. These are separate and distinct propositions.

> Q:    Would you agree with me that we've gone through the documents underlying your report. There are no documents describing historic PCB spills?
>
> A:    Again, with the caveat that spills would not have been reported prior to reporting requirements which only existed for -- only since the late '70's.
>
> Q:    But that would be speculation about a spill that we don't have a document to support, right?
>
> A:    I would agree, yes.

(Pl.'s Mot. Strike 3.)

Champion reiterates that a consideration of the site history was simply a factor in developing Prattke's opinions. Champion also argues that "site history and operations . . . has in fact played a role in determining liability in CERCLA cases . . . ." (Def.'s Resp. Mot. Strike 8.)

The court is in agreement that it is a leap to state that the "size and complexity of the CNH site proves the contaminated fill came from CNH." (Pl.'s Reply Mot. Strike 9.) Certainly, it would be speculation to say that a malfunctioning transformer that "could have resulted in a release of PCB fluids" *did* result in an actual release of PCBs—just as it would be speculation to say that a lack of documentation of any historic PCB spills (particularly in light of information that CNH had been heavily using PCBs in their operations, that the CNH Property had known PCB-contaminated areas, and that reporting requirements of PCB spills were not implemented until the late 1970s) *did not* result in an actual release of PCBs. To the extent that Prattke makes this leap, the court agrees that his testimony would be speculation.

However, it is not clear at this time whether Prattke opines just that. In fact, as previously discussed, Prattke's consideration of CNH's site history is only one of the factors underpinning his opinion that PCB-contaminated fill "likely" resulted from the release of PCB fluid from an industrial transformer or electrical switchgear at the CNH Property. Moreover, Prattke analyzed the site history in conjunction with "Aroclors typically used in transformers present at the CNH site," "concentration values found in the contaminated material," and "estimations of the mass of contamination in

comparison to the volume of PCB fluid historically used in industrial electric equipment" at the CNH Property. (Def.'s Resp. Mot. Strike 8.) Indeed, even CNH relies, to a large extent, on the site history of Racine Steel Castings to buttress its argument that the PCBs originated from Champion's property. Thus, the court is not persuaded, at least at this time, that Prattke's consideration of the size, complexity, and site history of the CNH Property should be stricken on the basis that it does not comply with *Daubert's* test for reliability.

Prattke has significant experience with PCBs and environmental remediation. CNH has not attacked (at least in its moving brief) that Prattke is not qualified based on his knowledge, skill, experience, training, or education. Rather, CNH has attacked the reliability of Prattke's opinions, without exploring, in detail, the application of the *Daubert* guideposts to its criticisms.[10] Because Prattke bases his opinions on multiple considerations, CNH's piecemeal challenges to the reliability of his opinions are unsuccessful. The court is satisfied at this time that Prattke's opinions are sufficiently reliable. Accordingly, CNH's motion to strike certain opinions of Champion's expert Prattke will be denied.

## B. Origination

According to Champion, "[b]oth parties, through expert and factual witnesses, dispute where the fill material originated." (Def.'s Reply Br. in Support of its Mot. for Summ. J. (hereinafter cited as "Def.'s Reply Mot. Summ. J.") 1.) However, CNH claims that the undisputed facts reveal that the fill material came from Racine Steel Castings. CNH relies on fact and expert witnesses to support its origination argument. First, CNH relies on the following factual witness testimony: (1) Tooker testified that the material came from Racine Steel Castings; and (2) CNH employees saw Champion

---

[10] To the extent CNH fashioned its arguments to these guideposts in its reply memorandum, such arguments, which could have been presented in its original memorandum, need not be considered.

truck in the material from off-site. Next, CNH argues that the following expert witness testimony supports its origination claim: (1) the high level of PCB contamination has no identifiable source on CNH Property; (2) the PCB-contaminated fill material has a unique "fingerprint," which does not resemble any of the CNH areas with historic PCB contamination; (3) relatedly, Aroclor 1254 is not present in the contaminated fill; and (4) the fill material contains slag that did not come from CNH operations on the Property.

First, CNH's factual witness evidence does not establish that the fill material originated from Racine Steel Castings. To be sure, Tooker testified that the material used to fill the CNH Property "had come from a pile of crushed brick, block, and concrete from -- from the Champion's Racine Steel site." (Tooker Dep. 86:17-19, July 7, 2010, ECF No. 54, Ex. 5.) However, Tooker also testified that he was told that the crushed concrete in that pile had come from the CNH Property. Tooker testified that, although Gorniak told him this information, he had "no information on where it came from other that what [he had] been told." (Tooker Dep. 87:15-16, 88:13-14.) Champion does not dispute that the fill material was transported from Racine Steel Castings to the CNH Property; it disputes that the fill material originated at Racine Steel Castings. Thus, Tooker's deposition testimony that he believed that the fill material came from a pile located at Racine Steel Castings may be true even if it *originated* from the CNH Property. Indeed, Tooker did not know the material's place of origination. Along the same lines, although CNH employees saw Champion truck in the material from an off-site location, this in no way proves that the fill material originated from Racine Steel Castings—it merely confirms what is undisputed: that Champion trucked in fill material (whether it originated from the CNH Property or Racine Steel Castings) from off-site. Thus, CNH's factual witness testimony does not demonstrate beyond dispute that the fill material originated from Racine Steel Castings.

Turning to CNH's proffered expert testimony, I disagree with CNH that it indisputably establishes that the contaminated fill material originated from Racine Steel Castings. At the outset, it is worth noting that CNH's experts appear to have concluded that the PCBs in the fill material could not have originated at the CNH Property, but evidence that the PCBs originated at Racine Steel Castings is lacking. It is one thing to say that the PCBs did not come from the CNH Property. It is another thing to say that the PCBs came from Racine Steel Castings. Certainly, as will be discussed below, CNH has to do more than prove only that the contaminated fill material did *not* originate from its Property; it must prove that Champion is a "responsible person."

Importantly, Champion illustrated several valid limitations in CNH's experts' opinions. For instance, the CNH Property encompasses approximately 100 acres, and it is unclear how many areas have been sampled for PCBs. "[A] soil sample is a relatively small, discrete point out of 100 acres." (Van Dyke Dep. 52:21-22, Dec. 16, 2010, ECF No. 51, Ex. 1.) Thus, there is no question that one sample represents only a small percentage of the Property. The parties dispute whether CNH sampled enough material of its 100-acre site, which could have implications on any claim that the contaminated fill material had a "significantly higher concentration of PCBs than historically found anywhere else on the Property." (Pl.'s Br. in Support of Mot. for Partial Summ. J. (hereinafter cited as "Pl.'s Mot. Partial Summ. J.") 19.) Simply stated, CNH has not clearly indicated how much of its Property was compared to the R9 area in which the disputed PCB-contaminated material now lays.

With respect to the fingerprint analysis and the absence/presence of Aroclor 1254, the court does not find this expert evidence dispositive of the origination issue either. As discussed above, Prattke has opined that there are limitations of the kind of fingerprint comparison analysis done in this case, namely, that the soil was tested at different times, using different equipment, and interpreted by different analysts. Moreover, it is unclear why the November 2007 analytical testing has been

discredited. It may be that the test results were discredited for the very reasons identified by Prattke.

Putting Prattke's opinion regarding the limitations of the fingerprint comparison analysis in this case aside, Champion also contests CNH's claim that the "fingerprint" of the contaminated fill is unique, on the ground that CNH tested only a few areas of its 100-acre site for PCBs and it "never tested any building material or concrete transformer pads for PCB contamination that could compare to the constituents that constitute the fill material at issue in this case." (Def.'s Resp. Br. in Opposition to Pl.'s Mot. for Partial Summ. J. (hereinafter cited as "Def.'s Resp. Mot. Partial Summ. J.") 14.) It also appears that CNH's expert did not attempt to determine whether any environmental studies performed of the Property pre-1992 existed. Thus, claims that the fingerprint analysis are "unique" as compared to any other fingerprint analysis of the 100-acre site or that "the CNH areas with historic PCB contamination [do not] resemble that of the contaminated fill material," (Pl.'s Mot. Partial Summ. J. 18), are based on inferences that simply cannot be conclusively drawn in CNH's favor at this stage of the case.

Finally, the court turns to the evidence presented by CNH's slag experts. According to CNH, its expert,

> Charlie Shirvani [("Shirvani")], plant metallurgist since 1991, inspected the slag and knew unequivocally it did not come from the foundry operations at CNH. Further, University of Wisconsin Professor [James M.] Tinjum [("Tinjum")] tested for the specific gravity of slag samples taken from the contaminated fill material, and they were not consistent with that of a grey iron foundry slag such as CNH operated.

(Pl.'s Mot. Partial Summ. J. 19 (internal citations omitted).) Shirvani bases his conclusion in large part on his memory of slag production during his employment at CNH dating back to 1991, and his observation of the appearance of the slag. According to Shirvani, the slag he observed while employed at CNH was "dark to greenish olive color." (Shirvani Dep. 15:19, Feb. 16, 2011, ECF No.

62, Ex. H.) One side "becomes milky, kind of gassy,[11] almost gray. The other side kind of dark, from dark glossy to olive dark greenish." (Shirvani Dep. 15:4-7.) The slag he observed in the contaminated fill was "light creamy to brownish, reddish, orange." (Shirvani Dep. 57:5-6.) However, Shirvani's observation of the slag in the contaminated fill differs from Tinjum's observation of the same slag, which he described as mostly glass-like (obsidian), green or black colored slag. (Tinjum Dep. 42:25-45:2, Feb. 16, 2011, ECF No. 62, Ex. G.) Because Shirvani relies in large part on his observation of the appearance of the slag, his opinion that the slag did not originate from the CNH Property is undermined by differing descriptions of the appearance of the slag. These discrepancies in the description of the slag give rise to factual questions more appropriately determined by a trier of fact.

Tinjum's analysis likewise suffers from limitations that cannot be resolved on summary judgment. Although Tinjum testified that the specific gravity of the slag samples taken from the contaminated fill were not consistent with that of a grey iron foundry slag, many of the obsidian slag samples Tinjum took fell below the ranges expected of a steel furnace slag as indicated by recent reports. (Tinjum Dep. 69:6-70:18.) Champion also challenges Tinjum's conclusion based on his admission that he does not have any knowledge regarding the specific processes at the CNH Property that produced the slag and that he had no knowledge of the CNH Property's operational history. (Def.'s Resp. Mot. Partial Summ. J. 16.)

Further, neither Shirvani or Tinjum analyzed the slag in any other material at the Property—material that is not disputed to have originated at the Property—to compare to the slag in the contaminated fill. (Def.'s Resp. Mot. Partial Summ. J. 15.) For the foregoing reasons, CNH's

---

[11] Because the witness was describing the appearance of the slag, the court believes it more likely that the word "gassy" is a typo in the transcript of the proceedings, and that the witness actually described (or meant to describe) the slag as "glassy."

slag experts do not indisputably support its claim that the contaminated fill originated at Racine Steel Castings.

Simply put, CNH's fact and expert witnesses do not unequivocally prove that the contaminated fill originated at Racine Steel Castings, and not at its Property. Thus, the origination of the contaminated fill constitutes a material issue of fact, and a triable issue of fact remains.

## C. CERCLA

Specifically, CNH has brought this action against Champion for recovery of response costs under § 107(a) of CERCLA, 42 U.S.C. § 9607(a), and it also seeks a declaratory judgment regarding Champion's liability under § 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2). CNH contends that Champion is liable under CERCLA for the response costs that it has already incurred and for future response costs. Champion opposes the imposition of CERCLA liability for remedial or future costs associated with the potential clean-up of the contaminated fill material because (1) CNH cannot prove that it has incurred necessary response costs consistent with the national contingency plan ("NCP") and because (2) Champion is not a "responsible person" under CERCLA.[12]

*1. Cost Recovery Action*

Section 107(a) of CERCLA imposes liability on certain private parties for the cleanup costs associated with a hazardous waste contamination. To establish a defendant's liability under CERCLA, a four-part test must be met: (1) the site in question is a "facility" as defined by CERCLA; (2) the defendant is a "responsible person" for the spill as defined by CERCLA; (3) there was a release

---

[12] Champion also argues that CNH is not entitled to § 113 contribution under CERCLA because it has not been subject to any enforcement action. CNH "concedes that it has not been the object of a civil action under § 106 or § 107(a)," and therefore, it is "unable to maintain a § 113 action at this time." (Pl.'s Resp. Br. to Def.'s Mot. for Summ. J. (hereinafter cited as "Pl.'s Resp. Mot. Summ. J.") 1.) Therefore, Champion's motion will be granted with respect to CNH's claim for § 113 contribution.

of hazardous substances; and (4) such release caused the plaintiff to incur response costs that are consistent with the national contingency plan ("NCP"). *See Envtl. Transp. Systems, Inc. v. ENSCO, Inc.*, 969 F.2d 503, 506 (7th Cir. 1992). Champion does not dispute that the Property is a "facility" or that PCBs were released on the Property. Instead, Champion argues that CNH has not incurred "necessary" response costs consistent with the NCP and that it is not a "responsible person" for the spreading of PCBs on the Property.

### a. Whether CNH Incurred Necessary Response Costs Consistent with the NCP

To establish liability under § 107, a plaintiff seeking private cost recovery under CERCLA must demonstrate that it incurred response costs in compliance with the federal Environmental Protection Agency's NCP. 40 C.F.R. § 300.700(c)(2); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000). In other words, incurring response costs in compliance with the NCP is an element of the prima facie private cost recovery action under CERCLA. *See* 42 U.S.C. § 9607(a)(4)(B); 40 C.F.R. § 300.700(c). The NCP requires that the proposed clean-up method in which the costs will be incurred be submitted for public comment before it is implemented. *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 616 (7th Cir. 1998). CNH agrees that it did not submit any proposals for public comment. In fact, the Property has not been cleaned up, and the record does not indicate whether any proposals for clean-up even exist.

However, many courts have held that initial investigation, site-assessment, and monitoring costs are recoverable under § 107(a) of CERCLA irrespective of compliance with NCP requirements. *The City of Gary v. Shafer*, No. 07-CV-56, 2009 U.S. Dist. LEXIS 47113, at *48 (N.D. Ind. June 2, 2009); *LeClercq v. The Lockformer Co.*, Case No. 00 C 7164, 2002 U.S. Dist. LEXIS 8092, at *9 (N.D. Ill. May 6, 2002) (citing *PMC, Inc.*, 151 F.3d at 616-17); *Cont'l Title Co. v. Peoples Gas Light and Coke Co.*, No. 96 C 3257, 1999 U.S. Dist. LEXIS 14729, at *10 (N.D. Ill. Sept. 15, 1999)

(compiling cases). These courts have held that such costs are also "necessary," stating "such costs are necessary under the NCP as '[o]btaining preliminary information on the levels of hazardous substances in the surrounding soil and sediment seems a necessary step before any further action can be properly taken.'" *The City of Gary*, Case No. 07-CV-56, 2009 U.S. Dist. LEXIS 47113, at *49; *Continental Title Co.*, No. 96 C 3257, 1999 U.S. Dist. LEXIS 14729, at *12 n.2 (quoting *Gache v. Town of Harrison, NY*, 813 F. Supp. 1037, 1046 (S.D.N.Y. 1993)). This court is persuaded that, because any clean-up proposal and, consequently, any clean-up of a contaminated site must first be preceded by an investigation of the nature and extent of contamination, such investigative and assessment costs need not be incurred in compliance with the NCP and are "necessary." Accordingly, CNH's initial investigation and assessment costs, subject to Champion's CERCLA liability, are recoverable.

b. Whether Champion is a "Responsible Person"

CERCLA's liability provision applies to four types of responsible parties: owners, generators, arrangers, and transporters of hazardous wastes. To establish Champion's liability under CERCLA, CNH relies on all types of responsible parties except "owner." That is, CNH contends that Champion is liable as a "generator," an "arranger," and a "transporter" of hazardous wastes.

A "generator" under CERCLA is defined as follows: "[A]ny person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2).

An "arranger" under CERCLA is defined as follows:

[A]ny person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

22

42 U.S.C. § 9607(a)(3). Because CERCLA does not specifically define what it means to "arrange[]

for," the Supreme Court has stated that, in "common parlance," "the word 'arrange' implies action

directed to a specific purpose." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599,

129 S. Ct. 1870, 1879 (2009) (citing *Merriam-Webster's Collegiate Dictionary* 64 (10th ed. 1993)).

Thus, the Court stated that "an entity may qualify as an arranger under § 9607(a)(3) when it takes

intentional steps to dispose of a hazardous substance." *Id.* (citing *United States v. Cello-Foil Prods.,

Inc.*, 100 F.3d 1227, 1231 (6th Cir. 1996)).

Finally, a "transporter" under CERCLA is defined as follows:

[A]ny person who accepts or accepted any hazardous substances for transport to
disposal or treatment facilities, incineration vessels or sites selected by such person,
from which there is a release, or a threatened release which causes the incurrence of
response costs, of a hazardous substance."

42 U.S.C. § 9607(a)(4).

There is no dispute that, at some point in time, Racine Steel Castings was a facility at which

PCB-containing transformers were present. Champion argues that it disposed of all PCBs before

contracting with CNH. However, as CNH points out, Gorniak has no record or recollection of who

he hired to dispose of the PCBs.[13] Prattke indicates that a 2005 aerial photograph of the Racine Steel

Castings site, which was acquired by the Southeastern Wisconsin Regional Planning Commission,

shows that "all standing structures that would have housed the transformers and electrical equipment

at the RSC site had been removed prior to when the photographs were taken." (Prattke Aff. ¶¶ 9-10,

ECF No. 75.) That there existed no standing structures at Racine Steel Castings, however, does not

unequivocally establish that PCBs were not present at Racine Steel Castings in 2005. As previously

---

[13] Although 40 C.F.R. § 761.209 indicates that entities are required to retain copies of PCB
disposal manifests for a period of only three years, the fact remains that Gorniak still has no
*recollection* of whom he contacted to undertake an important task of removing PCBs from
Champion's property.

discussed, the issue of origination is hotly contested, and the issue of origination presents material issues of fact.

Because the parties dispute where the PCB-contaminated fill material originated, it is premature to determine whether Champion is a "responsible person." The question of where the contaminated fill material originated must be resolved first to determine whether Champion is a "responsible person."[14] Thus, the parties' respective motions for summary judgment with respect to CNH's claims for cost recovery under CERCLA will be denied.

### 2. Declaratory Relief

Because CNH has not incurred response costs that are unnecessary or that are not compliant with the NCP, it has not "doom[ed] its bid to obtain a declaratory judgment as to liability for its future costs . . . ." *See Colton v. American Promotional Events, Inc.-West*, 614 F.3d 998, 1006 (9th Cir. 2010). It is true, as Champion points out, that the court in *Colton* held that a predicate to a claim for declaratory relief is success on a claim under Section 107. *See id.* at 1007-08. Because the party seeking declaratory relief in *Colton* failed to comply with the NCP in its past response action, the court did not award declaratory relief for future liability. The court stated as follows: "Providing declaratory relief based on mere assurances of future compliance with the NCP would create little incentive for parties to ensure that their initial cleanup efforts are on the right track." *Id.* at 1008. Here, because liability for past costs has yet to be determined, CNH's claim for declaratory relief survives Champion's summary judgment motion. However, for the same reasons that CNH's motion

---

[14] A responsible person includes the current owner of the facility, and a current owner is liable, unless it demonstrates a statutory defense applies to it. *See Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir. 1994) (citing 42 U.S.C. § 9607(1)-(2); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir. 1989)). CNH argues that it was an "innocent landowner" under § 107(b) (42 U.S.C. § 9607(b)). However, the triable issue of fact that exists as to the origination of the contaminated fill precludes summary judgment in CNH's favor on its "innocent landowner" defense.

for summary judgment on its cost recovery claim is denied, CNH's claim for declaratory relief under CERCLA will also be denied.

## D. Breach of Contract

According to CNH, Champion breached the following contractual provision: "The contractor shall fill all pits, basements, utility tunnels and other subsurface openings located on said real estate with crushed construction grade fill concrete (comprised from concrete and concrete block obtained at the Project Site) as specified by the Owner." (PPFOF ¶ 4.) CNH contends that Champion breached the contract in "at least two separate and independent ways": (1) by depositing PCB-contaminated materials onto its Property, and (2) by depositing fill that originated from some place other than its Property. (Pl.'s Mot. Partial Summ. J. 16.)

As previously discussed, the issue of origination presents a triable issue of fact. CNH has been unable, at this stage, to prove as a mater of law that the fill material originated from some place other than CNH's Property. To be sure, Champion does not dispute that the fill material it deposited on CNH's Property was not "construction grade." Importantly, however, the contractual provision to which CNH cites also indicates that the construction grade fill concrete to be used is to be "specified by the Owner." And, CNH has pointed to no contractual provision indicating that Champion was required to test the fill material. In the end, the breach of contract issue is not as "cut and dry" as CNH makes it out to be.

Champion, on the other hand, moves for summary judgment on CNH's breach of contract claim, assuming that the PCBs originated from CNH's Property. With this assumption, Champion relies on Section 10.3 of the Contract, labeled "Hazardous Materials." Section 10.3.3 provides that the "Owner shall indemnify and hold harmless the Contractor . . . from and against claims, damages, loses and expenses . . . arising out of or resulting from performance of the Work in the affected

area . . . ." (Lutz Aff. ¶ 2, Ex. 2.)  For the same reasons described previously, Champion's motion for summary judgment on CNH's breach of contract claims fails.  The origination of the PCBs must first be determined before examining whether a breach of contract has been committed.  Because this is a disputed issue, both summary judgment motions with respect to CNH's breach of contract claim will be denied.

**E.  Negligence and Nuisance**

Generally stated, "[t]he test of negligence is whether the conduct foreseeably creates an unreasonable risk to others."  *Hoida, Inc. v. M&I Midstate Bank and McDonald Title Co., Inc.*, 2006 WI 69, ¶ 22, 717 N.W.2d 17, 291 Wis. 2d 283 (quoting *Morgan v. Pa. Gen. Inc. Co.*, 87 Wis. 2d 723, 732, 275 N.W.2d 660 (1979)).  Wisconsin courts have engaged in a four-element analysis to determine whether an actionable claim for negligence has been stated: "(1) the existence of a duty of care on the part of the defendant, (2) a breach of that duty of care, (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and (4) actual loss or damage resulting from the [breach]."  *Id.* ¶ 23.

CNH's negligence claim is predicated on two grounds: (1) "the contract sets forth a standard of care that required clean fill material—'construction grade'"; and (2) "Champion had a duty of ordinary care to its customer CNH not to dump PCB contaminated fill material." (Pl.'s Resp. Mot. Summ. J. 13-14.)  With respect to the contractual standard of care CNH argues Champion owed, CNH argues that Champion had a duty under the Contract to use fill material that was "construction grade."  CNH contends that, by depositing fill material on its Property that smelled of diesel, it did not meet the standard of care set by its Contract, and it should have foreseen the risk of harm.  Because it should have foreseen the risk of harm in dumping fill material that smelled of diesel, Champion also violated its common law duty of ordinary care.

Champion seeks judgment on CNH's negligence claims for two reasons. First, Champion argues that CNH has failed to show that Champion owed any duty to CNH regarding "'handling, storage and disposal of the solid and hazardous wastes, pollutants or contaminants'" at issue in this case." (Def.'s Mot. Summ. J. 16 (quoting Am. Compl. ¶ 30).) Second, Champion argues that "CNH has failed to set forth any evidence regarding the standards of ordinary care for "'handling, storage and disposal of the solid and hazardous wastes, pollutants, or contaminants.'" (Def.'s Mot. Summ. J. 16.)

Champion's first argument—that CNH has failed to show that Champion owed it any duty—is easily dismissed. As specified in the contract, Champion owed a duty to CNH to use construction grade fill material. CNH claims that "Champion should have confirmed it was dumping clean fill because the contract required it." (Pl.'s Reply Mot. Partial Summ. J. 11.) However, CNH does not indicate what provision in the Contract set forth such a requirement. In fact, the evidence suggests that the environmental assessments were completed by entities other than Champion. That being said, that Champion may not have had a contractual obligation to test the fill material does not negate the fact that Champion still contracted to provide construction grade fill material.

Champion next argues that CNH has not introduced expert evidence regarding the industry standards for ordinary care. According to Champion, CNH's common law negligence claim fails because "what constitutes ordinary care with regard to professional services is determined by standard industry custom and practice." (Def.'s Mot. Summ. J. 18 (citing *Morden v. Continental AG*, 2000 WI 51, ¶ 56; *Milwaukee Cold Storage Co. v. York Corp.*, 3 Wis. 2d 13, 25 (1958)). Because "[s]tandards of ordinary care regarding the 'handling, storage and disposal of the solid and hazardous wastes, pollutants or contaminants' fall outside common knowledge or ordinary experience," (Def.'s Mot. Summ. J. 18), and because CNH has not provided any expert evidence on the applicable standard

industry custom and practice or any evidence that Champion's performance was not done with ordinary care, Champion is entitled to summary judgment on this claim.

The court in *Racine County v. Oracular Milwaukee, Inc.*, 2010 WI 25, 781 N.W.2d 88, 323 Wis. 2d 682, clarified the holding of *Milwaukee Cold Storage*. It stated the following:

> *Milwaukee Cold Storage* does not hold that a prerequisite to proving breach of a services contract is a showing of the failure to perform consistent with standard industry custom and practice. Rather, in that case, this court recognized that "accompanying every contract there is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing to be agreed to be done, and that a negligent failure to observe any of such conditions is a tort as well as a breach of contract . . . ." That a negligent failure to perform a contract with care and skill gives rise to a breach of contract claim is an entirely different matter from what is necessary to prove [the plaintiff's] breach of contract claim.

2010 WI 25, ¶ 29 n. 8 (internal citations omitted). In *Oracular Milwaukee, Inc.*, the court found that Racine County's breach of contract claim did not present issues so "unusually complex or esoteric"; rather, "the alleged breaches concern[ed] matters of common knowledge and [were] within the realm of ordinary experience." *Id.* ¶ 30. Therefore, the court in *Oracular Milwaukee, Inc.* found that the trier of fact was capable of determining whether there was a breach of contract without the assistance of expert testimony.

CNH's reliance on *Oracular Milwaukee* for the proposition that "*Milwaukee Cold Storage* does not imply an industry custom in every contract," (Pl.'s Reply Mot. Partial Summ. J. 11), therefore is misplaced. *Oracular Milwaukee* involved a breach of contract claim, not a negligence claim, as CNH has asserted in this case. And, as the court indicated, "a negligent failure to perform a contract with care and skill [that] gives rise to a breach of contract claim is an entirely different matter from what is necessary to prove [the plaintiff's] breach of contract claim." This language suggests that, sometimes, evidence regarding standard industry custom and practice may be necessary in a negligent failure to perform a contract claim. Along the same lines, where a claim is based

strictly on common law negligence, standards on industry custom and practice may shed light on whether a party exercised ordinary care. *See Morden*, 11 N.W.2d 659, ¶ 56 ("nonconformance with industry custom is not conclusive proof of a failure to exercise ordinary care").

Thus, the question becomes whether evidence regarding industry custom and practice is needed to establish whether Champion exercised ordinary care. More precisely, the analysis boils down to whether Champion's actions concern matters of common knowledge or ordinary experience. CNH claims that Champion should have known that dumping fill material that smelled of diesel might cause harm to CNH, and that a "juror is capable of determining whether Champion exercised ordinary care by depositing PCB contaminated materials from Racine Steel Castings onto CNH's property." (Pl.'s Resp. Mot. Summ. J. 16-17.)[15]

All that having been said, to determine whether Champion exercised ordinary care, Champion's activity must be undisputed. Champion's performance, however, is contentiously disputed. Because Champion's activity is disputed, whether Champion failed to act with ordinary care hinges on the resolution of the origination issue. And, as this court has indicated through and through, the place of origination of the contaminated fill material is a triable issue of fact. The analysis of whether Champion was negligent may proceed very differently depending on where the PCBs originated. Therefore, Champion's motion for summary judgment and CNH's motion for partial summary judgment with respect to CNH's negligence claim will be denied.

The court will also deny the parties' respective motions relating to CNH's nuisance claim. Wisconsin law requires a plaintiff asserting a nuisance claim to prove the following four elements: (1) a private nuisance exists; (2) the interference resulted in significant harm; (3) the defendant was

---

[15] CNH has not directed this court's attention to any evidence in the record demonstrating that anyone from Champion knew that the fill material smelled of diesel.

negligent; and (4) the defendant's negligence caused the private nuisance. Wis. J. I. - Civil 1922. Because a defendant's negligence is an element of a nuisance claim, and because CNH's negligence claim cannot yet be resolved, CNH's nuisance claim also cannot yet be resolved.

## F. Strict Liability

CNH claims that Champion is strictly liable for engaging in abnormally dangerous activity. In determining whether an activity is abnormally dangerous, the following factors are to be considered: (1) existence of a high degree of risk of some harm to the person, land or chattels of others; (2) likelihood that the harm that results from it will be great; (3) inability to eliminate the risk by the exercise of reasonable care; (4) extent to which the activity is not a matter of common usage; (5) inappropriateness of the activity to the place where it is carried on; and (6) extent to which its value to the community is outweighed by its dangerous attributes. *Grube v. Daun*, 570 N.W.2d 851, 856-57, 213 Wis. 2d 533 (1997) (citing Restatement (Second) § 520). "Upon review, where the facts are undisputed, whether an activity is abnormally dangerous 'is to be determined by the court, upon consideration of all the factors listed in sec. 520, and the weight to be given to each that it merits upon the facts in evidence." 570 N.W.2d at 856.

Champion argues that CNH's strict liability claim must be dismissed because Champion's activity could have been performed safely with the exercise of ordinary care and because CNH "wrongly focuses on the resulting harm—the disposal of hazardous materials—as the basis for analyzing an abnormally dangerous activity rather th[an] Champion's activity at CNH's property as defined in the contract." (Def.'s Mot. Summ. J. 20.)

With respect to CNH's strict liability claim, the parties cannot even agree on what activity Champion engaged in. Champion argues that the activity to be analyzed is its contracted for performance of demolishing and grading the site. CNH argues that the activity to be analyzed is the

taking of PCB-contaminated fill material from another property and disposing of it on CNH's Property. Herein lies the heart of this controversy: it is Champion's very conduct that the parties dispute. Indeed, Champion's activity, which has already been determined to be a triable issue of fact, could dictate whether strict liability is applicable.[16]

Simply put, CNH's strict liability claim also depends on the resolution of the origination issue. Accordingly, the parties' respective motions on the issue of strict liability will be denied.

## G. American Safety Risk Retention Group

Because Champion's liability has not yet been determined, it has not yet become necessary to determine whether ASRRG has a duty to indemnify Champion for its (potential) liability in this matter. That matter is more appropriately left for another day.

**NOW THEREFORE IT IS ORDERED** that Champion's motion for summary judgment be and hereby is **GRANTED** in part and **DENIED** in part;

**IT IS FURTHER ORDERED** that CNH's motion for partial summary judgment be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that CNH's motion to strike Champion's expert Michael Prattke be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that Champion's Civil L.R. 7(h) expedited non-dispositive motion to strike CNH's amended responses to Champion's proposed findings of fact be and hereby is **DENIED**;

---

[16] Notably, Champion argues that its "activity at CNH's property could have been performed safely in exercise of ordinary care." (Def.'s Mot. Summ. J. 20.) This conclusion, however, depends on Champion's actual activity relative to the PCBs being deposited on CNH's Property. The court is highly doubtful that CNH's Property is equipped to handle and store PCB waste, even if Champion disposed of the PCBs with the utmost care.

**IT IS FURTHER ORDERED** that ASRRG's motion to strike CNH's reply brief in support of its motion for partial summary judgment be and hereby is **DENIED** as moot;

**IT IS FURTHER ORDERED** that, on April 12, 2012 at 9:30 a.m., in Courtroom 242, U.S. Courthouse, 517 East Wisconsin Avenue, Milwaukee, Wisconsin 53202, the court will conduct a conference with the parties to discuss the further processing of this action to final resolution and judgment.

**SO ORDERED** this 26th day of March 2012 at Milwaukee, Wisconsin.

**BY THE COURT:**

s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge
